<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JONATHAN J. GARCIA, | Case No.: 2:17-cv-08053 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | |

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
P.O. BOX 1798
RAHWAY, N.J.  07065 On behalf of Plaintiff

EVELYN ROSE MARIE PROTANO
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET
6TH FLOOR
PHILADELPHIA, P.A.  19123
        On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Jonathan J. Garcia for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401,

et seq.) and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (42

U.S.C. §§ 1381, et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge

("ALJ") denying the applications; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court affirms the Commissioner's decision that Plaintiff was not disabled.

## I.    PROCEDURAL HISTORY

On September 26, 2014, Plaintiff filed an application for DIB, and on December 11, 2014, Plaintiff filed an application for SSI.  Both applications alleged a disability onset date of October 6, 2013.  (R. 181-90.)[2]  On December 9, 2014, the Commissioner determined that Plaintiff was not disabled and denied the applications.  (R. 64, 116-17.)  Plaintiff filed for reconsideration, and on February 9, 2015, the applications were again denied.  (R. 80, 93.)  On November 15, 2016, an Administrative Law Judge held a hearing on Plaintiff's applications; Plaintiff was represented by counsel at the hearing.  (R. 40-63.)  On February 23, 2017, the ALJ issued a decision denying Plaintiff's applications.  (R. 13-39.)  On August 10, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-5), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  On October 10, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On April 24, 2018, Plaintiff consented to have a U.S.

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  In April 2018, Ms. Berry resumed her role as Acting Commissioner.  *Patterson v. Berryhill*, No. 18-cv-193(DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); *see* 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record on appeal.  ECF No. 7.

Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 5.[3]  The case was reassigned to the undersigned Magistrate Judge on March 28, 2019.  ECF No. 18.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for Social Security disability benefits.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the

record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

## B.    **Standard for Awarding Benefits**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1505(a), 416.905(a).[4]  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a

---

[4] Although the standards for disability are the same under Title II (42 U.S.C. §§ 401, et seq.) and Title XVI (42 U.S.C. §§ 1381, et seq.) of the Social Security Act, these are separate government programs subject different qualification requirements.

diagnosis, or a medical opinion.  *Id.* §§ 404.1521, 416.921.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5]  The claimant bears the burden of proof at Steps One through Four.  At Step Five, the burden shifts to the Commissioner.  *Id.* §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).  At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step.  20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit.  *Id.* §§ 404.1572(a) & (b), 416.972(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims."  *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations. *Id*. §§ 404.1522, 416.922. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id*. §§ 404.1526(b)(2), 416.926(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id*. §§ 404.1560, 404.1565, 416.945, 416.960. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id*. §§ 404.1569a(a) & (b), 416.969a(b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing postural or manipulative functions such as reaching, stooping, climbing, crawling, crouching, handling, or fingering; difficulty tolerating environmental or physical features of certain work settings such as dust or fumes; or difficulty maintaining concentration or understanding detailed instructions. *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience, and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform

substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. §§ 404.1569a(d), 416.969a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. §§ 404.1569a(c), 416.969a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 23 years old on October 6, 213 (alleged onset date), and his date last insured was December 18, 2018. (R. 18, 31.) At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 18.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: attention deficit hyperactivity disorder (ADHD); bipolar disorder; anxiety disorder; obesity; bilateral torn rotator cuffs, status post right rotator cuff repair; history of head injury; and history of drug and alcohol abuse. (R. 19.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 19-22.) At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work subject to various exertional and non-exertional limitations. (R. 22-31.) The ALJ also found at Step Four that Plaintiff was unable to perform his past relevant work as a bank teller. (R. 31.) At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 201.28 if Plaintiff had the RFC to perform the full range of sedentary work. The ALJ also found at Step Five that at least three jobs – sorter, document preparer, and order clerk food and beverage – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC. (R. 32.) The ALJ concluded that Plaintiff was not disabled from the alleged onset date through February 23, 2017 (decision date). (R. 31.)

Plaintiff attacks the ALJ's decision on two fronts.  First, Plaintiff contends that the ALJ erred at Steps Three and Four by failing to consider obesity.  Second, Plaintiff contends that the ALJ erred at Step Four because the RFC finding lacked evidentiary support and did not include all credibly established limitations.  Plaintiff asks the Court to reverse and remand for payment or, alternatively, for a new hearing.[6]  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.    SUMMARY OF RELEVANT EVIDENCE[7]

### A.    Treating Physicians.

The medical record includes treatment notes from:  Dr. Michael J. Baum (family medicine practitioner) from October 2013 to March 31, 2014 (R. 371-420, 425-26, 432-48); Drs. Mohnish Ramani (orthopedic surgeon, arthroscopy) and Robert M. Lombardi (orthopedic surgeon, hand and upper extremity) from November 2013 to October 2014, April to July 2015, and October to November 2015 (R. 464-87, 492-537, 589-98);  Dr. Aphrodite M. Zimmerman (neurologist) from November 2013 (R. 420-24, 427-31); Dr. Shanthi Chezian (psychiatrist) from November 2013 to May 2014 (R. 612, 614-22, 678-84); William C. Sanderson (psychologist) from May to June 2014 (R. 611, 685-91);  Dr. Olga M. Tchikindas (psychiatrist) from October to December 2014 (R. 449-

---

[6] The "opening statement" section of Plaintiff's brief requests that the Court reverse the ALJ's denial of benefits and remand for payment (ECF No. 16 at 1), but this is merely boilerplate.  Plaintiff repeatedly requests throughout the remainder of her brief that the Court remand for a new hearing.  *See id*. at 12, 18, 26.

[7] The Local Rules require that a plaintiff's brief include both a "statement of the case" (indicating briefly the course of the proceeding and its disposition at the administrative level) and a separate statement of facts (with references to the administrative record).  Local Civ. R. 9.1(e)(5)(B) & (C).  Plaintiff's brief contains a one-paragraph section entitled "Procedural History/Statement of Facts" that is devoid of any facts.  ECF No. 16 at 1-2; *see id*. at 3-26 (citing only to ALJ decision).  This omission hampers the Court's ability to understand and analyze Plaintiff's arguments and is a failing that should not be repeated by counsel in future submissions to the Court.

63, 488-91, 623-39); and Dr. Trevor Forbes (psychiatrist) from February 2015 to December 2016 (R. 538-46, 599-605, 613, 640-77). The medical record also includes October 2013 emergency room records for head and foot injuries (R. 327-45), and Plaintiff's treatment file from a March 2014 voluntary admission to a mental health facility (R. 346-70). The ALJ's decision contains a comprehensive discussion of treating physician evidence. (R. 20-29.) Rather than recite the ALJ's discussion, the Court discusses in Section V. below the treating physician evidence that is relevant to the issues on appeal.

      **B.**     **Consultative Examiners.**

      On August 27, 2014, Dr. Robert Rekker (psychiatrist) performed a consultative evaluation. (R. 692-94.) Plaintiff stated that, at the age of 16, he made a suicide attempt by attempting to cut his wrist; he made a superficial laceration that required no treatment, and he never told anyone about the incident. In March 2014, he was hospitalized for one week at a psychiatric facility following an anxiety attack during which time he experienced suicidal ideation (he had thoughts of crashing his car and killing himself). Plaintiff's prescribed medications were Vistaril, Celexa, and Adderall. He was treated by his previous psychiatrist (Dr. Chezian) for eight months but had to switch because of an insurance issue. He was in therapy from January to June 2014 (with Mr. Sanderson) but discontinued because he was having difficulty making appointments and was not comfortable with the therapist. He had a pending psychiatric appointment (with Dr. Tchikindas). Plaintiff also stated that: he felt confused and anxious; his mood could change very quickly; he slept well after being prescribed Vistaril; his memory was poor and he frequently forgot appointments and forgot where he placed things; concentration was effortful with medication and non-existent without medication; he could manage daily hygiene tasks and maintain his residence; he used Percocet regularly from June 2011 through December 2013; and he had used marijuana

once every two months since August 2012.  Plaintiff further stated that he was currently diagnosed

with bilateral torn rotator cuff and wrist pain, for which he was prescribed Naproxen and a Flector

(Diclofenac) patch.

> Dr. Rekker's mental status examination findings were as follows:
>
> [Plaintiff] presented as a single 24-year-old male.  He was average height and had
> a heavy build.  His appearance was generally disheveled.  His attire was appropriate
> to the situation  Affect appeared restricted.  Speech was quite in volume, but of
> normal rate.  The claimant appeared alert and was oriented x3.  Remote memory
> appeared intact, although claimant was able to recall 3 items immediately, he only
> recalled 1 item after 5 minutes despite prompting.  He is able to complete serial 7's
> to 4 places without making any errors.  He spelled "world" forwards and backwards
> correctly.  He was able to complete all of the simple math problems.  The claimant
> was able to follow a simple 1-stage command, but when given a 3-state verbal
> command, he switched hands in the middle of the task.  The claimant could not
> interpret the proverb "two heads are better than one," but did accurately explain the
> proverb "don't judge a book by its cover."

Dr. Rekker diagnosed major depressive disorder, moderate; ADHD by history; opioid abuse, in

remission; and marijuana abuse.  His prognosis was "[f]air, given current interventions."  (R. 692-

94.)

### C.    State Agency Reviewing Consultants.

In December 2014, State Agency reviewing consultants opined that Plaintiff could:

frequently lift/carry up to 10 pounds; occasionally lift/carry up to 20 pounds; stand and/or walk

(with normal breaks) for a total of 6 hours; sit (with normal breaks) for a total of 6 hours; never

climb ladders, ropes, or scaffolds; and occasionally kneel and crawl.  They also opined that

Plaintiff was moderately limited in the ability to:  carry out detailed instructions; maintain attention

and concentration for extended periods; respond appropriately to changes in the work setting; and

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods.    Accordingly, Plaintiff's physical RFC was assessed as light work with postural

limitations, and his mental RFC was assessed as unskilled work. (R. 65-79.) In February 2015, State Agency reviewing consultants affirmed both the initial physical and mental RFCs, but limited Plaintiff to occasional lifting/carrying up to 10 pounds (instead of 20 pounds). (R. 81-92.)

### D.    Function Reports.

In May 2014, Plaintiff submitted a Function Report indicating that he lived alone in a room attached to his landlord's house. Some days were harder than others, and on those days he just felt like staying in bed because of depression, frustration and embarrassment caused by his ADHD and uncertainty about when a panic or anxiety attack might occur. He had difficulty falling asleep and waking up. He had no difficulty with personal care activities, but some days did not feel like getting dressed, showering, or shaving; he needed to be pushed to care for his hygiene. He used a pill organizer, but sometimes required a reminder to take his medicine. He did not cook or prepare his own meals. He ate what his landlord cooked, although some days he ate less to try to lower his BMI. He tried to mow the lawn twice a month but usually did not finish because he got sore. Sometimes he did not have the strength to clean his room. He tried to go out a few times each week. He did not drive because of his anxiety and road rage. He could go out alone. He shopped once a month for half an hour, and he paid his bills online. He overspent when he was overly depressed. He tried to read and meditate every day, and he spoke with his friends once a day. He had problems getting along with others because he got frustrated and aggravated when his anxiety and depression were triggered, and he worried about having panic attacks. He did not know how far he could walk without needing to stop. He had extreme difficulty paying attention and following written/spoken instructions; he did not finish what he started; and he sometimes felt intimated by authority figures. He was fired from JCrew and ShopRite before he was on medication. Stress and changes in routine made him very frustrated and depressed, and they also

triggered his anxiety which caused panic attacks.  He was prescribed ankle supports in 2013 for tendonitis in his legs, and he was experiencing bilateral shoulder pain. (R. 216-26.)

In October 2014, Plaintiff submitted another Function Report that was generally consistent with his May 2014 Report, except that:  he no longer mowed the lawn because of shoulder pain; he spent two hours every other week doing laundry and folding clothes; he went to the park once a week and to the gym several times a week; he could not pull or carry more than 15 pounds because of shoulder pain; he could walk half a mile before needing to stop and rest for five minutes; and he was prescribed bilateral wrist braces.  (R. 263-77.)

In May and October 2014, Plaintiff's brother, Marcus Garcia, submitted Adult Third Party Function Reports.  (R. 205-15, 287-95.)  The ALJ accurately summarized that lay testimony as follows:

> [Mr. Garcia indicated] that the claimant has a hard time paying attention, and complains about his shoulders all the time.  He stated that the claimant can only pay attention for about 30 seconds, has a hard time following instructions, and gets frustrated with changes in routine, which triggers panic attacks.  Mr. Garcia noted that the claimant cannot lift more than 20 pounds, and has a hard time completing tasks and concentrating.

(R. 23.)

### E.   Hearing Testimony.

In November 2016, Plaintiff testified during the hearing and was questioned by his counsel and the ALJ.  (R. 47-60.)  The ALJ accurately summarized Plaintiff's testimony as follows:

> The claimant testified at his hearing that he has panic attacks 2-3 times per week, during which he shakes[,] is unable to breathe, has crying spells, and suicidal thoughts.  He stated that he has difficulty getting along with others most of the time. The claimant reported that he has manic stages, where he overspends.  The claimant reported that he was hospitalized in March 2014 after having a panic attack and almost committing suicide.
>
> The claimant reported that he also has problems with both shoulders, noting that it is very difficult for him to lift items without pain.  He indicated that he cannot lift

even 10 pounds, and has trouble grasping things. The claimant testified that he has attempted to work 3 times since his alleged onset date, however, he has been let go because he was unable to perform the required job duties. He noted that it is very hard for him to remember things. After a panic attack, he needs to go into a room by himself and do relaxation exercises.

(R. 23.) Plaintiff's brief neither identifies any alleged inaccuracy in the Court's summary nor invokes any of his testimony that was not reflected in the Court's summary.

The VE also testified during the hearing. (R. 51-52, 60-62.) Among other things, the VE testified that three sedentary jobs would be available to Plaintiff based on a hypothetical question using the decisional RFC: one (Sorter DOT #209.687-022) was a semi-skilled job, and two (Document Preparer DOT 249.587-018 and Food and Beverage Order Clerk DOT 209.567-014) were unskilled jobs. The VE also testified that no jobs would be available to Plaintiff based on a hypothetical question that changed the decisional RFC from a 5% off-task limitation to a 15% off-task limitation.

## V.    DISCUSSION

### A.    Obesity.

At Step Two, the ALJ found:

With regard to the claimant's obesity, Social Security Ruling 02-1p requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters. Mohnish Ramani, M.D., reported on March 26, 2015, that the claimant was five feet eight inches tall and weighed 221 pounds, giving him a BMI of 33.6, placing him in the obese category.

(R. 19 (citing Exhibit 9F/9 [R. 555]).) Plaintiff contends that the ALJ committed two reversible errors. First, Plaintiff argues that the ALJ erred at Step Three by failing to consider whether Plaintiff's obesity (individually) or Plaintiff's combined impairments (including obesity) met or

was medically equivalent to any Listing.  Second, Plaintiff argues that the ALJ erred at Step Four

by failing to consider Plaintiff's obesity when crafting the RFC finding.  The Court disagrees.

### 1.    Step Three.

Social Security Ruling 02-1p provides explicit instruction for considering obesity at Step

Three.  The ALJ must determine whether the claimant's obesity by itself is *medically equivalent*

to any Listing.  For example:

> [I]f the obesity is of such a level that it results in an inability to ambulate effectively,
> as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for
> the major dysfunction of a joint(s) due to any cause (and its associated criteria),
> with the involvement of one major peripheral weight-bearing joint in listings 1.02A
> or 101.02A, and we will then make a finding of medical equivalence.

*Id*., *Titles II & XVI: Evaluation of Obesity*, 2000 WL 628049, at *5 (S.S.A. Sep. 12, 2002)).[8]  The

ALJ must also determine whether obesity in combination with any of the claimant's other

impairments *meets* any Listing.  "This is especially true of musculoskeletal, respiratory, and

cardiovascular impairments.  It may also be true for other coexisting or related impairments,

including mental disorders."  *Id*.  For example, Listing 12.05C (Intellectual Disability) can be

satisfied by "[a] valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or

other mental impairment imposing an additional and significant work-related limitation of

function" (POMS DI 341123.009 (emphasis added)) – and obesity satisfies the physical

impairment criterion of this Listing (S.S.R. 02-1p, 2000 WL 628049, at *5).  The ALJ must further

determine whether any combination of impairments (including obesity) is medically equivalent to

any Listing.  For example:

---

[8] Under Listing 1.00 B2b, "[i]neffective ambulation is defined generally as having insufficient lower
extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive
device(s) that limits the functioning of both upper extremities."  POMS DI 34121.011.  Listing 1.00J
requires an examination of the claimant's ability to ambulate without the device(s) in place.  *See id*.  The
Court observes that there is no record evidence that Plaintiff was prescribed or otherwise used such a device.

[O]besity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

S.S.R. 02-1p, 2000 WL 628049, at *5.

Plaintiff correctly asserts that the ALJ's Step Three discussion neither referred to any record evidence involving Plaintiff's obesity nor explained how the ALJ considered Plaintiff's obesity as to any Listing. These omissions are problematic in two respects. First, the Court cannot confirm that the ALJ applied the proper analytical framework. Second, even if S.S.R. 02-1p were properly applied, the Court could not meaningfully review the ALJ's analysis. There is no explanation for the ALJ's implicit finding that Plaintiff's obesity by itself was not medically equivalent to any Listing; that Plaintiff's obesity in combination with his ADHD, bipolar disorder, rotator cuff injury, head injury, or history of drug and alcohol abuse did not meet any Listing; or that Plaintiff's combined impairments were not medically equivalent to any Listing. The Court therefore finds that the ALJ erred at Step Three as to Plaintiff's obesity. *See Gullace v. Colvin*, No. 15-cv-7630 (FLW), 2017 WL 714356, at *9 (D.N.J. Feb. 23, 2017) (ALJ erred by "not adequately explain[ing] his consideration of Plaintiff's obesity in connection with the step three analysis").

18

Nevertheless, remand is warranted only if the ALJ's error in this regard was not harmless. Plaintiff bears the burden of explaining how the ALJ's decision would change if substantial evidence supported a finding that during the relevant period Plaintiff's obesity, either by itself or in combination with other impairments, met or was medically equivalent to any Listing. *See Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (plaintiff must "explain[] how, even if the ALJ's analysis was lacking, the deficiency was harmful to [her/]his claims," including "affirmatively point[ing] to specific evidence that demonstrates [s/]he should succeed"); *Gullace v. Comm'r of Soc. Sec.*, No. 15-cv-7630 (FLW), 2017 WL 714356, at *10 (D.N.J. Feb. 23, 2017) (citing *Woodson*). Plaintiff offers no argument that his obesity during the relevant period (by itself) is medically equivalent to any specific Listing, nor does he explain with citation to record evidence why his obesity during the relevant period (in combination with other impairments) meets or is medically equivalent to any specific Listing. S.S.R. 02-1p. The Court therefore finds that remand is not warranted because the error in the ALJ's obesity analysis at Step Three was harmless. *See*, *e.g.*, *Woodson*, 661 F. App'x at 766 (affirming Step Three finding where claimant "only says in very vague terms that an actual discussion of his impairments would lead to the conclusion that he was disabled at step three") (citations omitted); *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (no basis for remanding case even if Step Three analysis were deficient where claimant complained "in vague terms that certain impairments were not properly compared, separately and in combination, to the listings" without identifying "specific avenues for meeting or equaling specific listings that the ALJ should have considered but did not"); *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir. 2007) (affirming Step Three finding where Plaintiff "does not point to any medical evidence ignored by the ALJ that would show that [claimant's] impairments medically equaled one of the listings"); *Milano v. Comm'r of Soc. Sec.*,

152 F. App'x 166, 169 (3d Cir. 2005) (affirming Step Three finding where claimant "has not attempted to show that her impairments meet or equal any specific Listing, and merely concludes that she has 'severe medical conditions' that 'might' do so") (internal citation omitted)).

### C. Step Four.

Social Security Ruling 02-1p also provides explicit instruction for considering obesity at Step Four. As the ALJ explained:

> As indicated in S.S.R. 02-1p, obesity may have an adverse impact upon co-existing impairments. For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule. These considerations have been taken into account in reaching the conclusions herein.

(R. 23.) The ALJ specifically "considered the effects of the claimant's bilateral shoulder pain and obesity in assigning a sedentary residual functional capacity." (R. 27.) Plaintiff argues that "remand for obesity's exclusion from the RFC" is "urgent" because:

> This Court cannot possibly muster a clue as to what the ALJ was thinking, how she factored obesity into the sedentary RFC, or the 5% off-task or any other element of the functional capacity assessment. And the Court is not alone. No one reading this decision could formulate any reasonable idea with the slightest confidence because the decision plainly doesn't tell us anything regarding obesity. It appears at step 2 (and in the evidence), it disappears at step 3 and it reappears in templated form, *sans* evidence, saying nothing. All the decision gives us is vague promise of "consideration" without articulate analysis.

ECF No. 16 at 17-18. The Court finds that the ALJ's decision sufficiently considered Plaintiff's obesity at Step Four and, alternatively, that any error in this regard was harmless. The ALJ cannot be faulted for failing to discuss what does not exist. Plaintiff did not claim obesity as an impairment in his 2014 disability applications. Plaintiff did not claim in his Function Reports or

hearing testimony that his weight adversely affected his functional abilities.[9]    No treating physician, consultative examiner, or State Agency reviewing consultant opined that Plaintiff's obesity impacted his functional abilities.  Indeed, Plaintiff does not "affirmatively point to any evidence that his obesity actually imposed additional limitations on his ability to function in the workplace." *Gullace*, 2017 WL 714536, at *10.  As Judge Wolfson recently explained in rejecting a similar argument asserted by Plaintiff's counsel in a different case, a claimant who offers "a generalized response" that his weight makes it harder for him to perform activities "has failed to meet his burden, and as such, this Court finds the ALJ's error to be harmless."  *Id.* (citations omitted).

### B.  <u>Step Four – RFC Finding.</u>

At Step Four, the ALJ found that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except:

> [T]he claimant can lift a maximum of 10 pounds occasionally, and negligible weight frequently, can sit for 6 hours, stand and walk for a total of 2 hours in an 8 hour day, cannot do work above his head, can use his hands to grasp frequently, and based on his short attention span, difficulty functioning and other psychiatric symptoms will be off task 5% of an 8 hour day.

(R. 22.)  Plaintiff contends that substantial evidence did not support the RFC finding because it lacked evidentiary support and did not include all credibly established limitations.[10]  The Court agrees that the RFC finding is flawed but concludes that the ALJ's error was harmless.

---

[9] Plaintiff complains that "obesity played no part whatsoever in either the physical (fatigue) or the mental (fogginess) RFCs" without citation to any record evidence.  ECF No. 16 at 24.

[10] Plaintiff argues in this section of his brief that "the Commissioner has not carried her step 5 burden" because "the unexplained, evidence-free RFC relayed to the vocational expert does not include all of plaintiff's limitations[.]"  ECF No. 16 at 26.  But the alleged errors about which Plaintiff complains – namely, the failure to include additional limitations in the RFC finding – involve Step Four, where the burden of proof rests with Plaintiff.  *See Rutherford*, 399 F.3d at 554 n.8.  Plaintiff cites no legal authority requiring the ALJ to explain why the VE was questioned about limitations that were ultimately excluded from the RFC finding.  *See McGhee v. Comm'r of Soc. Sec.*, No. 08-cv-594 (FLW), 2014 WL 2618541, at

### 1.   Physical Impairments.

Th Court previously addressed in Section V.A.2. above Plaintiff's complaint that the ALJ did not consider obesity in crafting the RFC finding.  Plaintiff's only other physical impairment is his bilateral shoulder injury.  Plaintiff acknowledges that the decisional RFC limited him from working above his head.  He complains about the absence of additional limitations for "reaching in other direction on account of the same pathologies in both shoulders (Tr. 61), with no limitations in pushing and pulling either."  The only evidence on which Plaintiff relies to support additional limitations in the physical RFC finding is the following excerpt from Plaintiff's hearing testimony:

ALJ:    Okay. Well, let me ask you this.  Do you have any problems using your arm?  You said you had shoulder problems

PLTF:    Yes.

ALJ:    And which arm was that?

PLTF:    Both – both shoulders.

ALJ:    And so, what problems do you have?

PLTF:    Its very difficult for me to lift items without it hurting.

ALJ:    So what's the heaviest thing you can lift?

PLTF:    Not even 10 pounds.  I just, it will – it will come loose.  And I can't afford the surgeries for it.

ALJ:    So, let me ask you this.  Can you do – would you be able to do work above your head?

PLTF:    No, that's the worst.  If I put my arms above my head, the ball comes out of the socket, and my shoulder, both sides.  It even hurts when I'm not moving at all, if I'm just laying in bed, it will come loose, and it will –

ALJ:    Now how about the use of your hands?  Is that a problem?  Grasping things?

---

*9 (D.N.J. Jun. 12, 2014) (citing *Wallace v. Sec'y of Health & Human Svcs.*, 722 F.2d 1150, 1153 (3d Cir. 1983)).

PLTF:    Yeah, it's all connected.  If a grasp for too long, or grab things, it will be
very painful."

(R. 59-60.)  The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and the other evidence in the record.  (R. 23, 31.)

In November 2013, a bilateral shoulder MRI revealed:  on the left, an inferior labral tear, and partial tears of the infraspinatus tendon and of the attachment site of the supraspinatus tendon; and on the right, anterior inferior and postural inferior labral tears, and partial tear of the attachment of the supraspinatus tendon.  Despite these findings and Plaintiff's complaints of bilateral shoulder pain from October 2013 through May 2014, in October 2014, and in March 2015, Plaintiff's treating physicians reported normal strength in his upper extremities, normal motor and sensory function, and no areas of focal tenderness.  (R. 26.)  Plaintiff's Function Reports from 2014 reflect that, notwithstanding his shoulder pain, he was able to mow the lawn, drive a car, shop in stores, manage daily hygiene tasks, and maintain his evidence.  (R. 27.)  In April 2015, Plaintiff underwent arthroscopic repair of his right shoulder with labral repair and debridement; he thereafter commenced physical therapy and experienced improvements in his symptoms.  In May 2015, Plaintiff reported improved range of motion and decreased pain, and his treating physician reported normal motor and sensory examination findings.  (R. 26.)  By July 2015, Plaintiff was able to reach mid-level and overhead with on 1-3 level pain on a 10-point scale and had improved strength for carrying and lifting.  There is no evidence that Plaintiff sought any treatment for his shoulders after July 2015.  Nor is there any evidence that Plaintiff lacks the ability to perform fine or gross

movements with his upper extremities.  (R. 27.)  Indeed, in July 2016, Plaintiff was working part time as a bus boy.  (R. 25.)[11]

Plaintiff does not point to, and the Court has not identified, any – let alone substantial – evidence that Plaintiff's shoulder injury warranted a more restrictive RFC.  The Court therefore finds no error in the ALJ's analysis of Plaintiff's physical impairments as related to the RFC finding.

### 2.    Mental Impairments.

The ALJ's RFC finding included a limitation that Plaintiff will be off task 5% of an 8-hour day "based on his short attention span, difficulty functioning and other psychiatric symptoms." (R. 22; *see* R. 27 ("A limitation that the claimant will be off task 5% of an 8 hour day was assigned to consider his ADHD, bipolar disorder, anxiety, and history of head injury.").)[12]  Plaintiff contends that the RFC finding did not include all of credibly established limitations attributable to his mental impairments.  Plaintiff specifically argues:

> [H]ow does the limitation flow from the impairments?  And how much of a limitation is 5% off-task to begin with?  The average perfectly healthy worker doesn't produce work product continuously every[]one of the 60 minutes of every working hour.  People aren't robots which is why they are being replaced by them. A 5% off-task production rate is virtually built-in into every unskilled job according to virtually every vocational expert.  Over 10%, non-production for 7 minutes an hour[,] is where production becomes problematic for an employer.  The VE confirmed that no jobs would be available at 15% (Tr. 62).  "Severe" impairments by definition produce more than mild work-related limitations.  5% off-task isn't even a mild limitation, it is essential[ly] a fact of every day work life.  But it is the *only limitation* assigned to the combination of four "severe mental impairments," bipolar disorder, anxiety disorder, ADHD and head injury.  This doesn't make sense

---

[11] The Court notes that the ALJ's limitation to sedentary work is more restrictive than the opinion of Plaintiff's orthopedic treating physicians and the State Agency reviewing consultants that Plaintiff was limited to light work.  (R. 28, 30-31.)

[12] Plaintiff erroneously asserts that the "mental RFC finds no restrictions whatsoever flowing from plaintiff's recognized step 2 impairments of ADHD, bipolar disorder, anxiety disorder and head injury." ECF No. 16 at 21.

> on its face because, merely speaking definitionally, the severity findings are not
> compensated by the vocational restrictions they impose.

ECF No. 16 at 22-23 (emphasis in original).

The Court turns first to Plaintiff's history of head injury. As the ALJ explained:

> The record reflects that on October 6, 2013, the claimant sought treatment in the
> emergency room after he was assaulted by his boyfriend (Exhibit 1F [R. 327-45]).
> The claimant stated that he was punched multiple times in the head, and was
> complaining of a headache, but denied having dizziness or weakness. Upon exam,
> Douglas Mayer, M.D., stated that the claimant ambulated without assistance, had
> no focal motor or sensory deficits, no cerebellar deficits, and had normal range of
> motion in all extremities. A CT scan of the claimant's head was unremarkable,
> with no hemorrhage, or infarct.

(R. 23.) The ALJ stated that she limited Plaintiff to being off task 5% of an 8-hour day in part to

consider his history of head injury. (R. 27.) This was a generous assessment by the ALJ given the

record evidence (or lack thereof), and the Court finds that substantial evidence does not support

any additional RFC limitations based on Plaintiff's 2013 head injury.

The Court turns next to Plaintiff's ADHD, bipolar disorder, and anxiety disorder. Contrary

to Plaintiff's assertion, the ALJ explained in a painstaking 9-page evidentiary analysis the bases

for the mental RFC finding. (R. 22-31.) Plaintiff's brief cites to a single piece of evidence to

support his argument that substantial evidence supports an off-task limitation higher than 5% -

namely, the "GAF of 50 found by psychologists (Tr. 449-63)." ECF No. 22. The Court observes

that one treating physician – Dr. Tchikindas – assigned a GAF score of 50 on one occasion in

October 2014. (R. 28.) GAF scores are used by "mental health clinicians and doctors to rate the

social, occupational, and psychological functioning of adults." *Irizarry v. Barnhart*, 233 F. App'x

189, 190 n. 1 (3d Cir. 2007). "A GAF score of 50 or below indicates serious symptoms, while a

GAF score of 51 through 60 indicates moderate symptoms." *Rivera v. Astrue*, 9 F. Supp.3d 495,

504 (E.D. Pa. 2014). Although GAF scores have "fallen somewhat into disfavor," they remain

medical evidence that an ALJ must consider.  *Nixon v. Colvin*, 190 F. Supp.3d 444, 447 (E.D. Pa.

2016) (noting that American Psychiatric Association has abandoned GAF scale).  The ALJ

explained how she considered that evidence:

> Little weight is assigned to this GAF score, as it is inconsistent with the record as
> a whole.  In particular, this GAF score is inconsistent with Dr. Tchikindas'
> treatment notes which document that [] the claimant appeared calm and friendly,
> mood was not depressed or elevated, thinking was logical, short and long term
> memory were intact, was attentive, and had no indicators of psychotic process.  This
> GAF score is inconsistent with Dr. Forbes' treatment notes which stated that the
> claimant's mood was normal, affect was appropriate thinking was logical, short and
> long term memory and cognitive functioning were intact, had good communication
> skills, and had no signs of hallucinations or other psychotic processes.  This GAF
> score is inconsistent with Dr. Zimmerman's treatment notes which stated that the
> claimant's affect was euthymic, thought processes were linear and goal directed,
> thought content was appropriate, judgment was intact, insight was fair, and was
> cooperative, and was able to follow complex commands and written instructions.
> Moreover, GAF scores are highly subjective ratings that can easily vary from one
> practitioner to the next and generally represent only a "snapshot" of the presentation
> of information available from a subject on the day of assessment.

(R. 28.)[13]  As the ALJ further explained:

> The claimant's testimony regarding the functional limitations caused by his mental
> impairments is inconsistent with his treatment notes.  The record indicates that once
> the claimant began receiving consistent mental health treatment, and was compliant
> with his prescribed medications, his mental status has remained stable.  In contrast
> to his testimony that his symptoms have been significantly limiting, he informed
> Dr. Forbes that he was "doing fantastic" and "doing wonderful."  Dr. Forbes has
> noted at multiple exams that the claimant's mood was euthymic with no signs of
> depression or mania, presented as relaxed, attentive and communicative, and had
> no suicidal thoughts or hallucinations.  The claimant has been enrolled full time in
> college since 2015, and there is no evidence that he has performed inadequately.
> Moreover, other than 1 brief hospitalization in March 2014, the claimant has not
> required any further inpatient psychiatric treatment or suffered any significant
> decompensations since his alleged onset date.

(R. 25-26.)

---

[13] The Court also observes that Dr. Chezian assigned a GAF score of 70 in November 2013.  The ALJ
ascribed "some weight" to the score but concluded "after examining the record as a whole, that the
claimant's mental impairments are severe, and thus have resulted in slightly more imitations than this GAF
score represents."  (R. 29.)

For a reason not raised by either party, the Court cannot find that the ALJ's analysis Plaintiff's mental impairments was free from error as related to the RFC finding.  The ALJ ascribed "great weight" to the State Agency reviewing consultants' December 2014 opinion as to limitations attributable to Plaintiff's mental impairments because it was "consistent with treatment notes of Dr. Forbes and Dr. Tchikindas, which document that the claimant's medical status has been stable, with no psychotic symptoms."  (R. 30.)  The reviewing consultants specifically "opined that the claimant was able to sustain concentration, persistence, and pace for simple work functions, can follow simple instructions, can adapt to workplace changes for simple work functions, and can respond appropriately to supervisors and coworkers."  (R. 30.)  Put another way, as noted elsewhere in their opinion, the reviewing consultants opined that Plaintiff's mental impairments limited him to unskilled work.  (R. 78.)  The Court therefore finds that the ALJ erred by failing to include a limitation to simple or unskilled work in the RFC finding.  However, the Court further finds that such error was harmless, because the VE testified that two of the three jobs identified in response to a hypothetical question based on the decisional RFC – Document Preparer DOT 249.587-018, and Food and Beverage Order Clerk DOT 209.567-014 – were unskilled jobs.

## VI.    CONCLUSION

For these reasons, the Court affirms the Commissioner's decision that Plaintiff was not disabled as set forth in the accompanying Order.


Dated:   May 6, 2019                                                  s/ Paul A. Zoss
At Newark, New Jersey                                   PAUL A. ZOSS, U.S.M.J.

27